# In the United States Court
## For the District of Puerto Rico

| | |
|---|---|
| **JUANITA CARRASCO-CLAUDIO, a/k/a Juana Carrasco-Claudio, SEBASTIAN GARCIA-CORDERO, JOSE L. GARCIA-CORDERO, LUIS A. GARCIA-CORDERO and MARIEL QUIÑONES-VAZQUEZ, ON BEHALF OF HER MINOR DAUGHTER MIGQ**<br><br>*Plaintiffs,*<br><br>**Vs.**<br><br>**HOSPITAL MENONITA CAGUAS, INC., a/k/a Mennonite General Hospital, Inc. (Caguas), ABC INSURANCE COMPANY, DR. YESSI CARABALLO-LOPEZ, JOHN DOE-CARABALLO AND THE CONJUGAL LEGAL PARTNERSHIP BETWEEN THEM, SINDICATO PARA LA SUSCRIPCION CONJUNTA DE SEGUROS DE RESPONSABILIDAD PROFESIONAL MEDICO HOSPITALARIA (SIMED) AND RICHARD ROE INSURANCE COMPANY,**<br><br>*Defendants* | **CIVIL NO.  16-2503**<br><br><br>**TRIAL BY JURY DEMANDED** |

# C O M P L A I N T

**TO THE HONORABLE COURT:**

   **COME NOW** plaintiffs, through the undersigned counsel, and very respectfully, state, allege and pray as follow:

## I. NATURE OF THE ACTION

1.1     This is an action seeking compensatory damages by Plaintiffs Juanita Carrasco-Claudio, Sebastián García-Cordero, José L. García-Cordero, Luis A. García-Cordero and Mariel Quiñones-Vázquez on behalf of her minor daughter MIGQ, on their own behalf and the last four, as heirs of the causes of action of the deceased Sebastián García-Rivera.  They bring a cause of action against HOSPITAL MENONITA CAGUAS, INC. that arises under the provisions of the Emergency Medical Treatment and Active Labor Act ("EMTALA") 42 USC §1395, as to which they invoke federal question jurisdiction pursuant to 28 U.S.C. §1331, and supplemental jurisdiction under 28 U.S.C. §1367 over the claims arising under Puerto Rico law, also HOSPITAL MENONITA CAGUAS, INC. and codefendants Dr. Yessi Caraballo-López, her husband John Doe-Caraballo, and the conjugal partnership formed between them and all of their insurers, known and unknown defendants, inasmuch as these claims are related to the EMTALA claim and form part of the same case or controversy under Article III of the United States Constitution.

## II. JURISDICTION AND VENUE

2.1     This Court has jurisdiction over this action pursuant to 28 U.S.C.A. § 1331, inasmuch as the present action is brought in accordance with the provisions of 42 U.S.C.A. §1395dd, et seq.,

2.2     Venue is proper pursuant to 28 U.S.C.A. § 1391 since the claims asserted in this action arose in this judicial district.

2.3     This Court has supplemental jurisdiction over all causes of action arising under the Constitution and laws of the Commonwealth of Puerto Rico, specifically 31 L.P.R.A. §§ 5141, 5142, and 3142, as established by 42 U.S.C.A. §§ 1395dd, and 1367(a), inasmuch as all claims stem from the same nucleus of operative facts.

2.4     In accordance with the provisions of 28 U.S.C.A. § 1332, the Plaintiffs demand trial by jury.

### III. THE PARTIES

3.1     Plaintiff Juanita Carrasco-Claudio was the 40 years wife-in-fact of Mr. Sebastián García-Rivera.

3.2     Plaintiffs Sebastián García-Cordero, José L. García-Cordero and Alberto García-Cordero were all the offspring, of the deceased Mr. Sebastián García-Rivera, together with Angel M. García-Cordero (deceased).

3.3     Mariel Quiñones-Vázquez lived, as husband and wife, with Angel M. García-Cordero, who died on October 29, 2015. They both procreated minor child MIGQ. Together with his brothers, Angel inherited the survivors' claim from their deceased father. Hence, Mrs. Quiñones appears on behalf of her minor daughter MIGQ as sole heir to her deceased father's inherited claim in her own right, and also, by right of representation as heir to the deceased patient.

3.4     Hospital Menonita Caguas, Inc., a/k/a Mennonite General Hospital, Inc. is an entity duly organized in accordance with the laws of the Commonwealth of Puerto Rico, being a Medicare participating facility, which owns and operates an emergency department at its facilities in Caguas, Puerto Rico. As more particularly set forth below, the negligent acts and omissions of said defendant's agents or employees, as Dr. Yessi Caraballo-López and the hospital nursing staff caused and contributed to patient's damages and demise and also, to plaintiffs' damages as well, alleged herein.

3.5     Codefendant Dr. Yessi Caraballo-López, her husband with unknown identity at present, John Doe-Caraballo, and the conjugal partnership formed between them are citizens of

the Commonwealth of Puerto Rico.  Dr. Caraballo-López was the emergency room physician who inadequately screened, managed and negligently treated Mr. Sebastián García-Rivera on September 19, 2014 at the emergency room of the Hospital Menonita Caguas, Inc. and inadequately ordered his transfer to the Hospital Auxilio Mutuo in violation to EMTALA.

3.6    "Sindicato de Aseguradores para la Suscripción Conjunta de Seguros de Responsabilidad Médico Hospitalaria" (SIMED) is an entity duly organized in Puerto Rico in accordance with the laws of the Commonwealth of Puerto Rico, which provided medical malpractice insurance coverage to Dr. Yessy Caraballo-López.

3.7    ABC Insurance Company, at present with unknown identity, is an entity duly organized in Puerto Rico, in accordance with the laws of the Commonwealth of Puerto Rico which provided medical malpractice insurance coverage to Hospital Menonita Caguas, Inc., a/k/a Mennonite General Hospital, Inc.

3.8    Richard Roe Insurance Company, at present with unknown identity, is an entity duly organized in Puerto Rico, in accordance with the laws of the Commonwealth of Puerto Rico which provided medical malpractice primary or excess insurance coverage, to Hospital Menonita Caguas, Inc., a/k/a Mennonite General Hospital, Inc., and or to the rest of the codefendants in this case.

### IV. ALLEGATIONS OF FACTS COMMON TO ALL CAUSES OF ACTION

4.1    At the time of his demise, as more particularly set forth below, Mr. Sebastián García-Rivera was 70 years of age, with a history of hypertension, hyperlipidemia, coronary artery disease, atrial fibrillation and aortic valve replacement during 2012, for which he was given Metoprolol® 25 mg daily, Cozaar® 50 mg daily, Spironolactone® 25 mg daily, Hydrochlorothiazide® 25 mg daily and Coumadin®.

4.2     In the midst of 2014, Mr. García-Rivera was diagnosed as having a bilateral inguinal hernias, for which an ambulatory laparoscopic repair was scheduled for September 16, 2014.

4.3     His pre-operative laboratory evaluation revealed hemoglobin of 15.4 mg/dL, INR 2.97, Blood Sugar 119 mg/dL, BUN 38 mg/dL.  Mr. García was required to hold his oral anti-coagulant (Coumadin®) and was placed on Lovenox®, an injectable blood thinner.

4.4     As scheduled, Mr. García-Rivera underwent the elective bilateral hernia repair on September 16, 2014, without apparent complication and was discharged home the same day.

4.5     Early on September 19, 2014 Mr. García-Rivera started to sweat and feel tachycardic in his home, for which he was taken to the emergency department at Hospital Menonita Caguas.

4.6     Patient's triage was performed at 9:17 am and the nurse described his condition as "stable", although observing him with weakness, with a blood pressure of 80/56, pulse 125, respiratory rate 16 per min and hypoxic (pulse-oximetry 86%).

4.7     Ms. Neysha L Diaz-Flores, the ER nurse who recorded the triage note, became immediately aware that Mr. García-Rivera was a hemodynamically unstable patient suffering from - at a minimum - various emergency medical conditions to include: shock (hypotension), tachycardia and hypoxia.

4.8     The patient was evaluated by codefendant Dr. Yessi Caraballo-Lopez at the emergency room on or about 9:30 am, ordering laboratory testing, insufficient normal saline infusion of only 150 cc/hr., and supplemental oxygen, while patient's vital signs were not specifically documented or adequately addressed by her.

4.9     Placed in a cardiac monitor, Nurse Maria Alvarado-Sanchez registered patient's pulse and noted that he was still hypoxic and now bradycardic, with low pulse rate.

4.10    Because of Dr. Caraballo's order, patient's IV fluids intake was obviously inadequate, thus, he remained hypotensive and in shock state with hypoxemia; no differential diagnosis was made by codefendant Dr. Caraballo, neither had she considered bedside critical care services for patient's resuscitation and inotropic support to prevent damage to organ systems.

4.11    An arterial blood gas obtained at 9:07 am revealed evidence of metabolic acidosis, a typically condition associated with a shock state, abnormally high coagulation values, elevation in cardiac markers and evidence of renal failure.

4.12    Around 10:21 am, patient's laboratory testing revealed a hemoglobin value of 10.0 mg/dL, a significant drop from the adequate pre-operative baseline to clear an elective surgery in an anticoagulated patient, as the herniorrhaphy performed three days before, which strongly suggested the possibility of bleeding.

4.13    Even with the administration of supplemental oxygen, at 10:31 am patient's pulse-oximetry remained low at 86%.

4.14    At 11:00 am, patient was still severely hypotensive (BP 71/33) and hypoxic (pulse oximetry 86%).  However, codefendant Dr. Caraballo recorded patient's diagnosis as "hypoxemia, dizziness", with no mention of his persistent shock state.

4.15    Notwithstanding the abnormal lab results and patient's clinical presentation, no rectal examination was done by codefendant Dr. Caraballo nor was stool occult blood test obtained, which would have been strongly positive for gastro intestinal bleeding.

4.16    Dr. Caraballo failed to consider the standard differential diagnosis of hemorrhagic shock for similar such patients having undergone surgery while anti-coagulated.

4.17    As the direct result of not following a reasonably prudent algorithm to treat hypotension in a patient who underwent surgery while anticoagulated, hospital staff and Dr. Caraballo failed to resuscitate Mr. García-Rivera.  Instead, he was inadequately treated and kept in observation area, unstable, waiting for transfer to another hospital.

4.18    Since the onset of her interventions, she kept informing patient's family that she was transferring him to Hospital Auxilio Mutuo (HAM) in San Juan, as it was there where he was operated.

4.19    As wanted by defendants, Mr. García-Rivera was transferred that evening to HAM without proper stabilization.  His renal function was found to have worsened, his hemoglobin had dropped further to 8.6 mg/dL, his white blood cell count was very elevated, his hepatic enzymes were severely elevated and he was in severe and worsening metabolic acidosis (pH 7.18) due to his inadequately stabilized shock state.

4.20    Although the physicians at HAM properly began blood support with dopamine and norepinephrine, broad spectrum antibiotics, ordered a transfusion of blood and consulted multiple specialists, the patient continued to deteriorate.

4.21    Mr. García-Rivera had a cardiac arrest before midnight and received CPR, which was initially successful, but eventually passed away early in the morning of September 20, 2014.

## V.    MEDICAL MALPRACTICE & HOSPITAL NEGLIGENCE CLAIMS

5.1    Mr. García-Rivera was evaluated at Hospital Menonita Caguas (HMC) and, from the moment he stepped into the emergency department, the management and treatment by the nursing staff and Dr. Yessi Caraballo-López totally departed from the accepted standards.  Basic

principles of acute management of a patient in shock state were completely ignored by both, nursing personnel and Dr. Caraballo.

5.2     By not following the accepted and established medical standards during patient's stay at HMC, defendants deprived patient of his only opportunity to survive his medical condition.

5.3     During his stay at HMC, Mr. García-Rivera was negligently treated by the defendant physician, as its agent and HMC nursing personnel therefore being all jointly liable to plaintiffs for their negligent acts and/or omissions under the provisions of articles 1802 and/or 1803 of the Puerto Rico Civil Code.  HMC is also liable to plaintiffs for the violations of the EMTALA provisions by its medical and nursing personnel.

5.4     Plaintiffs also estimate that none of the defendants' agents or employees displayed the care or the previsions that a prudent and reasonable man would in such circumstances, thus, not offering patient the medical attention that was due to him, by correctly categorizing him as critical and treating him accordingly.

5.5     Codefendant Dr. Yessi Caraballo was grossly negligent in his treatment or lack thereof, to wit: failure to diagnose and implement corrective treatment in a timely manner; failure to order measures and medications which were indicated and necessary for the treatment of Mr. García-Rivera's condition and failure to stabilize the patient before transferring him to HAM.  Her negligent acts, errors and omissions directly caused or contributed to the damages, deterioration and death of Mr. García-Rivera.

5.6     SIMED, as insurer of Dr. Caraballo and all other insurance companies included herein, are liable to plaintiffs for its insureds' negligence.

5.7     Dr. Caraballo's conjugal partnership responds for plaintiffs' damages as it benefited from her medical practice.

## VI.    EMTALA VIOLATION

6.1     As previously alleged herein, Hospital Menonita Caguas, Inc. offers emergency medical care and is a participating hospital under the EMTALA provisions.

6.2     Mr. García-Rivera's damages and untimely death was caused by Hospital's violations of the screening and stabilization provisions of EMTALA and the negligent lack of treatment that was denied to him at its emergency department.  Had it not been by all these violations and the negligent acts, errors and omissions of all co-defendants his sufferings and demise, as well as plaintiffs' damages, could have been avoided.

6.3     Codefendant Dr. Caraballo, as agent of HGM, was grossly negligent in her treatment or lack thereof, to wit: failure to screen and inability to recognize clear signs and symptoms of patient's shock state; failure to make differential diagnoses and implement corrective treatment in a timely manner; failure to order measures and medications which were indicated and necessary for the treatment of patient's shock state condition; failure to order adequate tests and to stabilize patient before transferring to HAM. Her negligent acts, errors and omissions directly caused or contributed to the damages, deterioration and death of Mr. García-Rivera.

6.4     Codefendant Dr. Caraballo's acts and omissions and the hospital nursing staff also resulted in inappropriate and disparate screening and transferring the patient without stabilization, in violation of the EMTALA provisions, which directly caused and or contributed to the damages, deterioration and death of Mr. García-Rivera.

6.5     Hospital Menonita Caguas, Inc., through its agents and employees did not fulfill its statutory duty to screen and stabilize Mr. Rosado while staying and remaining in its facilities in a shock state, prior to transferring him to HAM.  On the contrary, patient's medical condition was never adequately screened and stabilized, but worsened each minute that went by without the appropriate management and treatment, resulting in a total medical catastrophe and his eventual demise.  Therefore, the unfortunate decision of HMC's agents by not screening and later transferring this very unstable patient, while not offering the medical attention that any other patient in his position would have received, were flagrant violations to EMTALA.

6.6     Plaintiffs' damages, concerning those resulting from Mr. García-Rivera's demise, are the direct consequence of the negligence and medical malpractice of defendant's agents or employees, while acting within the scope of their agency or employment with the HMC, a participating hospital under the EMTALA.

## VII.   DAMAGES

7.1     As the direct and proximate result of the negligent acts and omissions of defendant's doctor and the hospital nursing staff, amounting to medical malpractice and hospital negligence alleged heretofore and violations of EMTALA, co-plaintiff Juanita Carrasco-Claudio, aka Juana Carrasco-Claudio, has suffered, is suffering and will continue to suffer intense and permanent emotional damages as the result of the loss of companionship because the demise of her life partner, all of which are estimated in an amount of not less than $2,000,000.00.

7.2     As the direct and proximate result of the negligent acts and omissions of defendant's doctor and the hospital nursing staff, amounting to medical malpractice and hospital negligence alleged heretofore and violations of EMTALA, co-plaintiff Sebastián García-Cordero

has suffered, is suffering and will continue to suffer intense and permanent emotional damages for his father's demise, all of which are estimated in an amount of not less than $1,000,000.00.

7.3    As the direct and proximate result of the negligent acts and omissions of defendant's doctor and the hospital nursing staff, amounting to medical malpractice and hospital negligence alleged heretofore and violations of EMTALA, co-plaintiff José L. García-Cordero has suffered, is suffering and will continue to suffer intense and permanent emotional damages for his father's demise, all of which are estimated in an amount of not less than $1,000,000.00.

7.4    As the direct and proximate result of the negligent acts and omissions of defendant's doctor and the hospital nursing staff, amounting to medical malpractice and hospital negligence alleged heretofore and violations of EMTALA, co-plaintiff Luis A. García-Cordero has suffered, is suffering and will continue to suffer intense and permanent emotional damages for his father's demise, all of which are estimated in an amount of not less than $1,000,000.00.

7.5    As the direct and proximate result of the negligent acts and omissions of defendant's doctor and the hospital nursing staff, amounting to medical malpractice and hospital negligence alleged heretofore and violations of EMTALA, the deceased Angel M. García-Cordero suffered – until his death on October 29, 2015 - intense and permanent emotional damages for his father's demise, all of which are estimated in an amount of not less than $500,000.00. Her daughter MIGQ, as his sole heir, inherited the claim for his father's damages and also his participation as part of the heirs in her grandfather's inherited claim, in the amount stated heretofore.

7.6    As the direct and proximate result of the negligent acts and omissions of defendants and the hospital nursing staff, amounting to medical malpractice and hospital negligence alleged heretofore and violations of EMTALA, Sebastián García-Cordero, José L.

García-Cordero, Luis A. García-Cordero and the minor MIGQ, sons and granddaughter respectively of the deceased patient, inherited his cause of action (survivors' claim) for all his physical pain and emotional sufferings since his arrival to the HMC until his death the day after, all of which are estimated in the amount of $1,000,000.00.

7.7     For the purpose of interrupting the applicable SOL, the plaintiffs' causes of actions arising from the Puerto Rico Law were judicially claimed on September 8, 2015 at the Court of First Instance, San Juan Part, Civil No. KDP2015-0976, which complaint was voluntarily dismissed on February 22, 2016, entering judgment accordingly without prejudice.

**WHEREFORE**, it is respectfully requested from this Honorable Court to enter judgment on plaintiffs' behalf and against defendants, granting a judgment against co-defendants for the sums herein requested, together with pre-judgment interests, costs and reasonable attorney's fees and grant plaintiffs such other relief, as it may deem proper and necessary warranted by the proven allegations and the law.

In Caguas, Puerto Rico, this 18th. Day of August, 2016.

**Velazquez Law Offices, PSC**

Attorney for plaintiffs
PO Box 188
Caguas, Puerto Rico 00726
Tel. 787-744-9598
Fax 787-3482

S/*José F. Velázquez-Ortiz*
USDC-PR 123310
E-mail: jfvlaw@gmail.com